**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SANDRA ANN CHAMBERS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  4 CV 7376** |
| **v.** | ) | |
| | ) | **HONORABLE DAVID H.  COAR** |
| **ARUN Enterprises, Inc., et al.** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sandra Ann Chambers ("Plaintiff" or "Chambers") filed a nineteen-count complaint alleging various federal and state law claims against Theodore Collie and his associates ("Collie Defendants"), Arun Enterprises, Inc. and its officers ("Arun Defendants"), the Law Offices of Kameli & Associates, P.C. and its officers ("Kameli Defendants"), and the City of Chicago along with Chicago Police Department Superintendent Phillip Cline (together "Chicago Defendants") (collectively "Defendants").  Presently before this Court are the motions for summary judgment of the Collie Defendants (Doc. No. 213), Arun Defendants (Doc. No. 259), Kameli Defendants (Doc. No. 218), and Chicago Defendants (Doc. No. 224), filed pursuant to Federal Rule of Civil Procedure 56.  For the reasons stated below, Defendants' motions for summary judgment are GRANTED.

# FACTS[1]

From sometime in December 2003 or January 2004, Plaintiff began renting between 300 and 500 square feet within the workspace of Headrest Unisex ("Headrest"), operated by Raynie Jackson ("Jackson").  Headrest was located in Suite 412 in the 1 Quincy Court building at 220 South State Street ("1 Quincy Court").  Plaintiff entered into this sublease arrangement with Jackson for a period of at least one year and, under the lease's terms, was allowed to renew and remain until Jackson's lease with building manager Arun Enterprises was to expire approximately four to five years later.

Brian Leonard ("Leonard") and Theodore Collie ("Collie") were both Arun Enterprises employees who worked as security guards at 1 Quincy Court.  Leonard's included looking out for safety hazards in and around the building, attending to the security desk, and assisting all persons seeking access to the tenant floors.  The parties disagree as to whether or not Leonard acted beyond the limits of his position.

Collie shared some of Leonard's duties as an Arun security guard.  However, he also had additional powers and responsibilities by virtue of being a special police officer of the Chicago Police Department.  The general duties and powers of any special police officer are laid out in the Special Policeman and Security Guards Ordinance of the City of Chicago ("SPSGO"), §4-

[1]These facts are derived from the parties' statements of facts filed pursuant to L.R. 56.1(b).  To a large extent, Plaintiff has failed to support her statements of fact with citations to any record beyond her own allegations.  Insofar as these claims are nonetheless based on personal experience, they will be granted weight and considered accordingly.  However, to the extent Plaintiff states conclusions of law or assertions of fact beyond her own experience, they will be disregarded.  The fact that Plaintiff is pursuing her claims without the assistance of counsel does not relieve her from the strictures of L.R. 56.1.  *See Greer v. Bd. of Educ. of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001).  Beyond these considerations, the facts included herein are considered undisputed unless otherwise noted.

340 Chicago City Code. Collie was not authorized to carry a weapon, make arrests, conduct investigations, or issue citations.[2] The parties disagree as to whether or not Collie ever acted outside the boundaries of his position as a security guard or his authority as a special police officer.

In March of 2004, Plaintiff became aware that Leonard and Collie were interested in having their supervisor – Arun employee LaTeresa Chantler ("Chantler") – removed. That month, Leonard approached Plaintiff seeking her aid in securing Chantler's removal and, when she refused, he claimed there would be trouble for Plaintiff's business. Following this meeting, the two officers began to limit Plaintiff's access to the building and otherwise "mistreat" her.

In or around August, 2004, Plaintiff began to look into leasing another space from Arun through Chantler. Plaintiff first spoke with Chantler about this possibility, as well as Arun property manager Dwight Olson ("Olson"). On August 13, 2004, Plaintiff gave a money order intended to provide the down payment on a 100 square foot space in Suite 308. This money order was later returned. Chantler and Plaintiff discussed other options, including a smaller space or a lease transfer, but no lease was signed between Plaintiff and any of the Defendants as a result of these discussions. On August 26, 2004, Plaintiff wrote Arun a letter outlining the events surrounding her relationship with Collie and Leonard ("Aug. 26th Letter"). Plaintiff then met with Chantler and possibly other parties to discuss the allegations contained in this letter.

_____

[2]Plaintiff attempts to contradict the duties and obligations alleged to have been held by Leonard and Collie. However, her objections go to what she believed officers did, rather than what they were authorized to do, and therefore do not contradict Defendants' description of their formal duties. *See, e.g.,* Pl.'s Resp. to Arun Defs.' Facts ¶ 8 ("Whether or not [Collie] was 'authorized to,' 'what he did' and/or 'what he told the Plaintiff,' regarding carrying a weapon, making arrests, conducting investigations or issue traffic and parking citations are different things and the latter is of relevance herein and has not been denied.").

Nothing was done to address the problems discussed in this meeting. Plaintiff called and wrote a letter to Olson in September of 2004 for additional information, but never received a response to her inquiries.

In September of 2004, Plaintiff was locked out of her rental space at 1 Quincy Street by Jackson, her sublessor. This situation was resolved only after Plaintiff called the police and told them what had happened, as a result of which they demanded that Chambers be permitted to use the building for which she was paying rent. She then worked seemingly without incident until January 5, 2005. At this point, Jackson packed up most if not all of her things and moved them to a storage facility. At or around this time, Jackson also told Plaintiff that parties were conspiring against her. These comments appear to have referenced Chantler and other Defendants, and consisted of "bits and pieces of conversations that [Jackson] had and what would occur." Chambers Dep. at 149-51. Plaintiff does not have any information regarding the times, locations, or involved parties of those conversations.

At all relevant times Arun Enterprises retained Fred A. Joshua ("Joshua") of the Law Offices of Kameli & Associates, P.S., as its counsel. On or about September 9, 2004, at Chantler's request Joshua sent a letter informing Plaintiff that she would not be able to lease a space with Arun. The letter states in relevant part:

> Please be advised that we represent Arun Enterprises, Inc. in all their landlord-tenant matters.
>
> And as attorneys for Arun Enterprises, Inc., we hereby notify you that we are unable to lease a space with you at this time. You are currently seeking a 100 sq. feet space. The smallest space we have available now is 489 sq. feet.

> Enclosed please find your money order in the amount of $300.00.  We have no need for said draft as we will not be entering into a lease agreement with you.
>
> If you have any questions, please do not hesitate to contact me.

Compl. Ex. B.  Attached to this letter was Plaintiff's intended down payment.

In November, 2005, Chambers filed the instant case, invoking this Court's section 1331 subject matter jurisdiction.  The Complaint as it now stands contains eleven counts,[3] all of which are brought against all defendants in their individual and official capacities, except for Theodore Collie and Phil Cline, against whom claims are brought only in their individual capacities.  Due to the denial of a commercial lease, restriction of building access, and seizure of property without due process, by which Defendants retaliated against the Plaintiff, she now brings the following claims:

| Count 1: | Racial and Gender Discrimination under 42 U.S.C.A. § 1981 |
| Count 2: | Discriminatory Infringement on Property Rights under 42 U.S.C.A. § 1982 |
| Counts 3-6, 8, 10: | Denial of Constitutionally-protected Rights under 42 U.S.C.A. § 1983 |
| Count 9: | Denial of Constitutionally-protected Rights under 42 U.S.C.A. § 1982 |
| Count 11: | Conspiracy to Deny Civil Rights under 42 § U.S.C.A. 1985 |

Defendants filed 12(b)(6) motions to dismiss, which this Court denied in an opinion dated September 19, 2006.  All Defendant parties now move for summary judgment against all of Plaintiff's claims.

---

[3]All state law claims were struck as of January 18, 2006.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT MOTION

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving

party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). However, it is possible to rebut a motion for summary judgment with the allegations of a complaint, but only to the extent that they are based upon the plaintiff's personal experience. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (requiring that allegations are admissible at summary judgment under 56(e) so long as they are "based on personal knowledge and [set] forth specific facts showing that there is a genuine issue for trial"). The fact that those statements may be "self-serving" is not a valid grounds for deeming them inadmissible. *See id.*

Plaintiff is representing herself as a pro se plaintiff in this matter. Pro se status does not provide an excuse for sloppy drafting, or loosen the evidentiary requirements under consideration. However, at a general level this Court must apply "less stringent standards" than

it would to "formal pleadings drafted by lawyers." *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999).

## ANALYSIS OF MOTION FOR SUMMARY JUDGMENT

In their motions for summary judgment, Defendants generally claim Plaintiff has failed to produce direct evidence of discriminatory animus, and has failed to meet the demands of indirect evidence under *McDonnell Douglas*. Several Defendants have also argued that the alleged facts cannot establish their liability as they were not implicated in the allegedly discriminatory actions.

a.    General Matters

This Court denied Defendants' motions to dismiss, but nonetheless warned Plaintiff that additional factual development was required: "While a lack of factual support may undermine Plaintiff's case at later stages, the standard for 12(b)(6) review states clearly that the plaintiff is not required to settle the facts or prove her claims, but must merely allege all elements of the crime so as to give defendants notice." Op. at 5 (citing Higgs, 286 F.3d at 439). Despite this warning, Plaintiff has not set forth evidence to properly support her claims.

When challenged on the extent to which she has supported her allegations with evidence, Plaintiff repeatedly retreats to the statements made in her original complaint or her own deposition. As stated above, it is true that a party faced with a summary judgment motion may cite to their own properly-framed statements drawn from a complaint. However, these statements are admissible for summary judgment only to the extent that they reflect on Plaintiff's own experience or realm of expertise. *See supra* note 1. In this instance, Plaintiff's responses to Defendants' motions for summary judgment rely on conclusions of law or allegations for which

she has no basis in personal knowledge.  *See, e.g.,* Resp. to Kameli Defs.' Summ. J. Mot. at 5

(claiming that "Plaintiff met [Defendants'] standard requirements for rental of commercial

space," but citing only to her complaint, her deposition, an unrelated minute order, and money

order receipts).  To the extent that Plaintiff was subsequently unable to support such summary

statements with evidence in the record, they are not sufficient for creating a triable issue of

material fact.

Plaintiff asks this court to overlook these evidentiary failings in light of her allegation

that Defendants have destroyed, stolen, or misplaced evidence that might have supported her

case.  *See, e.g, id.* at 1 n. 1, at 15.  However, she has failed to explain how the missing materials

might have bolstered her arguments so as to overcome the manifest failings described below.

*See generally* Chambers Dep. (repeatedly claiming that her missing notes would have allowed

her to describe events in greater detail).  It is not greater detail that the record is lacking, but

rather substantive evidence.  This Court therefore sees no basis for incorporating and imagining

the contents of evidence that has not been introduced into the record.

b.      Custom, policy, or intent on the part of Chicago Defendants

The liability of Chicago Defendants (Cline and the City of Chicago) arises from the

Chicago Police Department's alleged failure to properly supervise and train Defendant Collie in

his role as a special police officer affiliated with the police department.  *See* Chicago Defs.'

Facts ¶¶ 10-12; Pl.'s Resp. to Chicago Defs.' Summ. J. Mot. at 7-12.  Apparently, Plaintiff

believes that these failings placed Collie in a position of power at 1 Quincy Court without the

proper measures to prevent him from infringing on her constitutional rights.

At several points Plaintiff attempts to expand this interpretation of her claim. *See, e.g.,* Resp. to Chicago Defendants' Facts ¶¶ 10-11 ("At the deposition of the Plaintiff, she did not limit her claims of involvement and/or liability of [Cline] and [Chicago], but not limited thereto. [sic] Plaintiff "stood" on her verified complaint."). However, these efforts repeatedly return to allegations in the complaint and elsewhere that proffer no other wrongful actions on which to base liability. She alleges that "the state delegates a public function to private entity [Arun]," Resp. to Chicago Defs.' Facts ¶ 30, but fails to provide support for this conclusory allegation that simply tracks the language of color of law precedent. *See infra* pp. 20-26. She also claims that property was "stolen from the Plaintiff on January 5, 2005 by the Defendant...either directly and/or indirectly in conspiracy thereof while two City of Chicago police officers watched (Sgt. Bowden #816 and Officer Coriell #14372) (and would not file a criminal complaint for the Plaintiff nor stop the offenders)." This allegation also fails. The facts alleged in Plaintiff's complaint, to which she repeatedly returns, describe how the Chicago police department sent officers on two occasions in response to her calls, and how both times they assisted her against the Defendants and attempted to resolve the situation in her favor. *See* Compl. ¶¶ 196-232. How this amounts to lending the authority of "color of law" to the underlying endeavor is not explained and is generally unconvincing – at worst their alleged failure to adequately follow up on her calls was negligent. Plaintiff has therefore failed to expand these Defendants' basis for liability in the complaint allegations, evidence produced in discovery, or responses to summary judgment. Therefore, the factual basis on which Chicago Defendants' liability is based involves their role in training or supervising Collie as a special police officer.

Municipal liability under section 1983 cannot be based upon respondeat superior, but instead requires proof that the alleged constitutional deprivation took place as a result of an official policy or widespread custom of the municipality. *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 402-03, 117 S.Ct. 1382, 1387-88 (1997). Section 1981 also requires a policy or custom. *See Alexander v. City of Milwaukee*, 474 F.3d 437 (7th Cir. 2007). A plaintiff can show that a municipal policy or custom exists by establishing either: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with 'final policymaking authority.' " *McTigue v. City of Chicago*, 60 F.3d 381 (7th Cir. 1995).

Plaintiff has produced no evidence that any failure to train or supervise Collie was part of a formal policy or widespread custom of the City of Chicago as a whole. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (finding that a single incident is insufficient for establishing a municipal policy) ("Considerably more proof than a single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.") (footnotes omitted). Plaintiff attempts to save this argument by stating that one of the Defendants involved in the alleged deprivations had "final policymaking authority" – either Cline, Arun Enterprises, or Collie – and that its actions therefore amounted to a direct assertion of the City's policies. *See* Pl.'s Resp. to Chicago Defs.' Summ. J. Mot. at 8-9. On its face, the argument that a special police officer in the private employment of a commercial entity, or the

commercial entity itself, wields "final policymaking authority" for the City of Chicago is patently absurd. Not surprisingly, Plaintiff has produced no evidence to support this theory.

The only remaining party that might provide a basis for Plaintiff's claim of "final policymaking authority" is Defendant Phil Cline – CPD superintendent at the time – who was arguably involved in the failure to train and/or supervise Collie. As a matter of law, however, a superintendent is not a final policymaker with respect to the CPD. *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). Plaintiff has produced no evidence on this matter one way or the other, and has certainly provided no basis on which a reasonable factfinder could find that he was a policymaker at the much broader scale of the city in general. *See Ekermamn v. City of Chicago*, 2002 WL 1008458, at *2 (N.D. Ill. 2002) (refusing to attach policymaker status to CPD superintendent with respect to City of Chicago policies). Chicago Defendants' motion for summary judgment is therefore GRANTED with respect to all claims against the City of Chicago brought under sections 1981 and 1983 (Counts I, III, IV, V, VI, VIII and X).

In any event, Chicago Defendants are both dismissed as parties with respect to all counts due to the fact that no actual intent to deprive or discriminate can be inferred from the evidence produced and the nature of the claims against them. Discriminatory motivation or intent to deprive stand at the heart of each count of Plaintiff's suit. *See, e.g., Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir.1996) (requiring evidence of an intent to discriminate in actions brought under 42 U.S.C. § 1981); *Hamilton v. Svatik*, 779 F.2d 383 (7th Cir. 1985) (42 U.S.C. § 1982); *Majeske v. Fraternal Order of Police, Local Lodge No. 7*, 94 F.3d 307, 311 (7th Cir. 1996) (42 U.S.C. §§ 1983, 1985); *see also Chicago Hous. Auth. v. Fed. Sec., Inc.*, 161 F.3d 485, 488 (7th Cir. 1998) ("It is well established that a § 1983 claim requires proof of intentional acts

to deprive the victim of her civil rights."). Plaintiff's claim against the Chicago Defendants is based on their negligent failure to adequately supervise or train Defendant Collie, rather than any deliberate involvement in constitutional deprivation. These Defendants therefore lack the necessary intent for liability under sections 1981, 1982, 1983, and 1985, and all claims against them fail. Defendants' motions for summary judgment are GRANTED with respect to all counts against Defendants City of Chicago and Phil Cline.

       c.      <u>Liability of remaining Defendants under 42 U.S.C. §§ 1981, 1982 (Counts I, II, & IX)</u>

As an initial matter, Plaintiff has alleged that Defendants discriminated against her based on race and gender. To the extent that her claims are premised on gender, they fail to meet the requirements of sections 1981 and 1982. *See St. Louis v. Alverno Coll.*, 744 F.2d 1314, 1317 (7th Cir. 1984) ("[C]laims of sex discrimination are not cognizable under § 1981; the section applies only to alleged discrimination on the basis of race or alienage.") (citing *Runyon v. McCrary*, 427 U.S. 160, 167, 96 S.Ct. 2586, 2592, 49 L.Ed.2d 415 (1976)); 42 U.S.C. § 1982 ("All citizens...shall have the same right...as is enjoyed by white citizens..."); *see also Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir. 1996) (discussing the solely race-based protections of both statutes). For this reason, this Court need only determine whether Plaintiff has advanced sufficient facts on which a reasonable jury might find that she was discriminated against based on her race.

In order to proceed under either section, Plaintiff must therefore show that: (1) she is a member of a racial minority; (2) Defendants had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract in the case of § 1981, or the use and enjoyment of

property under § 1982). *See Morris*, 89 F.3d at 413. This Court must also consider the possibility that the actions taken against Plaintiff were done in retaliation against a protected action under these sections. *See generally Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007).

### i.     No direct evidence of discrimination based on race

Plaintiff has failed to produce direct evidence that might allow a trier of fact to find discriminatory intent "without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted). This essentially requires that a defendant admit to discrimination. *See id.* Plaintiff in the instant case states that she received hostile treatment in a manner which a reasonable person would find objectively discriminatory. However, while the factual allegations could be viewed as harsh or unfair, Plaintiff does not cite to anything, nor has she produced any evidence, objectively and undeniably demonstrating that the Defendants were motivated to act against her because of her status as an African-American, or took action because of a perceived threat of legal action based on discrimination.

### ii.     Direct circumstantial evidence of discrimination based on race

Plaintiff could also establish discriminatory intent by way of direct but circumstantial evidence of racial discrimination, from which Defendants' motivations could be inferred. *See Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601-02 (7th Cir. 2003). This requires that plaintiff establish some combination of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." (2) systematic

treatment of non-minority individuals to better conditions; and/or (3) a stated reason for the adverse action that is "unworthy of belief, a mere pretext for discrimination." *Id.*

Plaintiff has advanced almost no circumstantial evidence that racially discriminatory animus lay behind Leonard and Collier's actions. She invariably portrays them as personal attacks rather than manifestations of the class-based animosity for which the constitutional protections of sections 1981 and 1982 are reserved. Plaintiff's complaint alleges that she was unfairly retaliated against based upon her refusal to support Leonard and his compatriots' attempts to "get rid of" Chantler. Plaintiff herself alleged that it was due to her refusal to "state specific things against and about Lateresa Chantler" that Leonard and Collie "were not happy with how [Chambers] decided to not get involved with the campaign" against Chantler, and that they therefore "began an intentional, malicious, and calculating effort to ruin the friendship, business relationship, and harmonious working environment at Headrest Unisex." *Id.* ¶¶ 71, 74-75. She also alleges that the harassment grew particularly bad after it became clear she would not assist their crusade against Chantler. *See, e.g., id.* ¶ 120. None of this has anything to do with improper racial animus.

Plaintiff does mention discriminatory harassment by some parties at some points. *See, e.g., id.* ¶ 82 (referring to Leonard and Collie's "malicious harass [sic] of females"); *id.* ¶ 84 (claiming Leonard and Collie made "sexiest [sic] comments that [Chambers] must be a lesbian"). She also speculates as to the motives behind the actions allegedly taken against her. *See, e.g., id.* ¶ 253 ("If [Plaintiff] was white and/or a male the Defendants...would not have sought to discriminate against her."). When asked about racial discrimination at her deposition, she also mentioned that Collie once made a passing comment "Just like black people." Chambers Dep. at

125-26.  However, these amount to insufficient circumstantial evidence to support her claim that there was *racially* discriminatory animus motivating Defendants' actions against her *in this case*. Indeed, Plaintiff's description of the actions taken by Leonard and Collier's harassment – largely amounting to the changing of building access rules – had nothing to do with race or gender and everything to do with trying to coerce her into joining their cause against Chantler and/or getting rid of her as a perceived troublemaker.  *See id.* ¶¶ 85 et seq. (referencing Leonard's implementation of new building access rules that were being applied only to her); ¶ 156 (referencing her complaints that she was "being denied an office lease, without cause after she had complained about harassment, intimidation, and discrimination").  As she says, Leonard and Collier's actions may have been meant to "harass, intimidated [sic] and oppress her," *id.* ¶¶ 87, 100, but she fails to connect those actions to race-based animus as required by sections 1981 and 1982.

Plaintiff maintains that Chantler complained of Collie's discriminatory behavior, *see* Pl.'s Resp. to Arun Defs.' Facts ¶¶ 59-61; Compl. ¶¶ 129-31 (referring to "a few confrontational instances"), but Plaintiff has failed to show how this other complaint alleged or had anything to do with racial discrimination or the motivations at play in Plaintiff's situation.  When asked to provide evidence of another instance of discrimination by Defendants, Plaintiff claims that "she had evidence/information about someone else who had been discriminated against by [Leonard] and [Collie]."  *See* Pl.'s Resp. to Arun Defs.' Summ. J. Mot. at 16.  However, she was able to advance only vague, unsupported hearsay statement regarding Collie's discrimination against women.  *See* Chambers Dep. at 242-43.  Whether Plaintiff is to be believed or not when she claims that supporting evidence of discrimination was lost due to Defendants' own actions, these

allegations relate only to gender discrimination which, as stated above, is irrelevant to Plaintiff's section 1981 and 1982 claims. Other vague references to Defendants having been out to get her, references to Plaintiff being a lesbian, Compl. ¶ 84, or inappropriate changes to the building's entrance and exit policies, *id.* ¶ 85 et seq., are similarly irrelevant to the question of whether there was racial discrimination.

Despite the fact that neither her complaint nor her deposition contain strong circumstantial evidence of racial discrimination, Plaintiff repeatedly attempts to bolster that allegation with her own conclusory statements. *See generally id.*; Chambers Dep. However, this is insufficient to survive summary judgment. No affidavit supports her claim; no documentary evidence provides that support; and her own deposition goes far in supporting the fact that her claim is one for straightforward animosity rather than discrimination. Defendants have provided evidence that there was no discriminatory animus involved in her treatment, and mere speculation regarding their true motivations is wholly insufficient to proceed to trial.

Similarly, claims of retaliation based on Arun Defendants' failure to continue the leasing relationship or other actions taken against Plaintiff have not been tied to issues of race. Even if there were evidence that the declining relationship between the parties amounted to "retaliation due to her complaining of two security employees of Arun Enterprises, [Collie and Leonard]," *id.* ¶ 209, the Aug. 26th Letter in which she complained about their behavior made only vague references to gender-based concerns and made no effort to connect the underlying actions to race-based concerns. *See* Pl.'s Supp. Docs. Ex. 34 at 4. For that reason, there was insufficient grounds for Defendants to believe that Plaintiff might have brought an action under sections 1981 or 1982, and therefore no basis for retaliatory liability under those sections.

If it is true that Defendants interfered with Plaintiff's contractual rights simply because of her unwillingness to attack Chantler, these actions may be reprehensible. However, even where the events are viewed in a light overly-favorable to the Plaintiff, there is no basis for ascribing discriminatory animus to what was more simply an inappropriate sequence of events: Plaintiff refused to assist Collie and Leonard in their attacks against Chantler; Collie and Leonard harassed her as a result; Plaintiff complained about the harassment; Arun chose to side with Collie and Leonard; Chantler and Jackson, fearing for their own positions, sided with Arun as well; all of the Defendants then took part in seeing Plaintiff removed from the premises. Taking this account of events as true, Defendants arguably acted against her and refused to treat her with the respect with which she was entitled. However, this is far from establishing that their actions were driven by discriminatory animus sufficient for creating a cause of action under sections 1981 and 1982. The circumstantial evidence produced during discovery provides no basis for moving beyond this understanding of events, and Plaintiff's summary judgment responses advance little else.

### iii. Indirect evidence of discrimination based on race

Defendants maintain that the lack of direct evidence is sufficient to warrant summary judgment. However, Plaintiff has the added option of pursuing her claim indirectly according to the burden shifting standard of *McDonnell Douglas*, transferrable from Title VII cases to the context of other claims based on discrimination. *See Anders v. Waste Mgmt. of Wisconsin*, 463 F.3d 670 (7th Cir. 2006) (applying *McDonnell Douglas* to a § 1981 claim); *see also Kundacina v. Concession Serv., Inc.*, 1997 WL 222943, at *2 (N.D. Ill. 1997). Indeed, Plaintiff responds to Defendants' motions for summary judgment in terms that appear to follow this standard. In

order to prove her case in this indirect manner, Plaintiff relies on two primary factual claims: that Defendants interfered with her use of personal property and space at 1 Quincy Street in violation of her contract, and that Arun refused to offer her a new lease following her conflicts with Defendant parties.  However, Plaintiff fails to account for the necessary elements of the burden-shifting approach that might prove that these actions were motivated by discrimination.

With respect to the alleged interference with her use of space at Unisex, Plaintiff's claims are unsupported in that she has provided no indication of disparate treatment based on race among either the guards that allegedly harassed her, Jackson who failed to uphold her contract with him, or the procedure by which her lease was terminated and she was refused another. Without evidence of the more-favorable treatment that other, non-minority individuals faced in a similar situation, Plaintiff has failed to provide evidence of a similarly-situated party, a necessary element of *McDonnell-Douglas* burden shifting.  *See Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 784 (7th Cir. 2001).  She therefore has no recourse to the indirect approach based on allegations that she suffered interference with her contractual relationships.

With respect to the actions of Arun in denying her additional space, Plaintiff claims but provides no support for her suggestion that she "met [Arun]'s standard requirements for rental of commercial space" – other than this unsupported assertion, she fails to show what those standards were or how she met them.  She claims to have been "denied commercial space that was available to persons outside of the protected class," but provides no evidence of whether any of the rental space in question was available at any time after the denial or who might have

rented it.[4]  She generally claims that she was denied her various rights "while similarly situated persons outside the protected class were not," but has not provided any point of comparison for determining the treatment of those who were not African-American.  Again, Plaintiff has failed to satisfy a necessary prong of the *McDonnell-Douglas* framework with respect to the retaliation alleged against Arun in failing to provide her with a new lease.  *Id.*

Unsupported assertions notwithstanding, Plaintiff has failed to provide sufficient evidence of a prima facie case of racial discrimination.  Therefore, she cannot support a burden shifting approach to proving discrimination indirectly.

Defendants' motions for summary judgment are GRANTED with respect to all claims brought under sections 1981 and 1982 (Counts I, II, and IX).

     d.      <u>Presence of a state actor under 42 U.S.C. § 1983 (Counts III, IV, V, VI, VIII, & X)</u>

Section 1983 requires that the underlying constitutional deprivation involve someone acting under color of law.  *Fries v. Helper*, 146 F.3d 452, 457 (7th Cir. 1998).  The Supreme Court has defined such an action as the "misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Luger v. Edmonson Oil Co.*, 457 U.S. 922, 929 (1982).  A state actor is considered present "when the state has cloaked the defendants in some degree of authority," or "when the defendants have conspired or acted in concert with state officials to deprive a person of his civil rights."  *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003).  Though the requisite state actor is typically a government officer, "§1983 may also be brought to bear on private individuals who exercise

---

[4]*See also* Resp. to Arun Defs.' Facts ¶ 29 ("Plaintiff was denied space currently renting in suite 412...").

government power." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 628 (7th Cir. 1999). A private party will be deemed to have acted under "color of state law" when the state either (1) "effectively directs or controls the actions of the private party such that the state can be held responsible for the private party's decision"; or (2) "delegates a public function to a private entity." *Id.* Only in these ways can a plaintiff establish the necessary "close nexus between the state and the private conduct so that the action 'may be fairly treated as that of the State itself.'" *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982)).

Plaintiff has taken several different approaches toward establishing that the alleged actions were performed under color of law, but primarily focuses on the involvement of Collie as a special police officer. Plaintiff is correct that Collie was a special police officer. However, this fact alone is insufficient for establishing color of law; courts have held that *in some instances* these officers operate as state actors subject to the constraints of section 1983, while in others they do not, a distinction that turns on the particular duties involved. *See Payton*, 184 F.3d at 628 (holding that it was at least possible for the plaintiff to establish that a special police officer was acting under color of law); *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 897 (7th Cir. 2004) (special police officer was not working under color of law insofar as he was not authorized to carry a firearm, performed only routine patrol duties, and would contact the CPD in the event of a serious disturbance); *United States v. Hoffman*, 498 F.2d 879, 881-82 (7th Cir. 1974) (finding that the special police officers acted under color of law insofar as they used police communications equipment and force where necessary, and were generally "authorized on a continuing and full-time basis to search actively for criminals and trespassers and to use the

powers of the state when their search is successful").  Thus an analysis of whether or not Collie

is the sort of special police officer who acted under color of law requires an examination of his

particular powers and duties.  *Tarpley v. Keistler*, 188 F.3d 788 (7th Cir. 1999) citing *Burton v.*

*Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) ("Only by

sifting facts and weighing circumstances can the nonobvious involvement of the State in private

conduct be attributed its true significance.").

According to some language found in the Chicago City Code, there seems to be little

difference between a regular police officer and a special police officer: "Special policemen shall

possess the powers of the regular police patrol at the places for which they are respectively

appointed or in the line of duty for which they are engaged."  SPSGO § 4-340-100.  At the same

time, the code appears to draw distinctions between the two, making sure to point out that special

officers are defined as something apart from "regularly appointed police officers of the city or to

any sheriff or deputy sheriff of the county."  *Id.* §4-340-010.  Whatever discrepancies might be

found in the Code itself, the Seventh Circuit has already considered its language and found that

private officers classified and registered according to its terms will act under color of law in

some cases and not in others.  *See, e.g., Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894

(7th Cir. 2004) (expressly considering the language of § 4-340-100, but still requiring an

analysis of the specific duties of the officer in question).[5]

---

[5]To some extent, *LaRabida Children's Hospital* appears to reverse the definite-sounding language of the Seventh Circuit's earlier opinion in *Payton*.  Based on little other than the SPSGO's description of special police officer duties, the *Payton* court found that "no legal difference exists between a privately employed special officer with full police powers and a regular Chicago police officer."  *Payton*, 184 F.3d at 630.  However, the *LaRabida* court reviewed that opinion in its full context and expressly rejected the proposition that the SPSGO language alone was dispositive of whether a special officer acted under color of law.  *LaRabida*

Defendant has produced evidence that Defendant Collie did not possess the specific duties that might lead a court to find that a special police officer is acting under color of law. *See generally* Collie Aff. (attesting to the officer's inability to carry or use a firearm, arrest suspects, conduct investigations, or issue either tickets or citations).  Plaintiff generally fails to contradict these factors separation Collie from the powers of the state.  Instead, she refers back to a presumptive statements in her complaint that "[t]he state delegates a public function to a private entity ("ARUN ENTERPRISES, INC.")."  *See, e.g.*, Pl.'s Resp. to Kameli Defs.' Summ. J. Mot. at 10 (referencing Compl. ¶ 26).  She also repeatedly quotes SPSGO language that this Court has already determined is not alone dispositive.  *See, e.g.,* Pl.'s Resp. to Arun & Collie Defs.' Facts ¶ 8.

Plaintiff further states that, regardless of what he was authorized to do, Collie claimed additional police powers, and seems to suggest that he was therefore more closely aligned with the powers of the state.  *Id.* ("[T]he record is clear and has not been denied that [Collie] told the Plaintiff that he had a gun, he could shoot her, and he could arrest her.") (citations omitted).  As Plaintiff points out, the color of law can expand beyond state-sanctioned actions to those illegitimately executed.  *See, e.g.*, Pl.'s Resp. to Kameli Defs.' Summ. J. Mot. at 7 (citing *United States v. Classic*, 313 U.S. 299, 326 (1941) for the proposition that "'[m]isuse of power" possessed by virtue of state law is action taken 'under color of state law'").  The cases Plaintiff cites in support of that proposition involve defendants who clearly had or were connected to some degree of color of law but nonetheless overstepped their legitimate authority.  *See, e.g.,*

---

*Children's Hosp.*, 372 F.3d at 897 (discussing *Hoffman*, 498 F.2d 879 and *Wade v. Byles*, 83 F.3d 902 (7th Cir. 1996)).

*West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250 (1988) (considering actions involving a physician under contract with the state working within a state prison hospital); *Screws v. United States*, 325 U.S. 91, 111, 65 S.Ct. 1031 (1945) (involving sheriff and a policeman); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598 (1970) (involving police officers); *Monroe v. Pape*, 365 U.S. 167, 184, 81 S.Ct. 473 (1961) (involving police officers).

However, as discussed above, in this instance Plaintiff has failed to establish that *any* actions taken by Collie carried the color of law, making an evaluation of whether or to what extent he overstepped the bounds of his authority premature. At a general level, what matters most is not what actions defendant took illegitimately, but rather the scope of what he was permitted to do legitimately in relation to those actions. *Gibson v. City of Chicago*, 910 F.2d 1510, 1518 (7th Cir. 1990) ("[W]e have found no authority for expanding this concept of 'pretense' of law to encompass the actions of an official who possessed absolutely no authority to act but nonetheless assumed the position of an imposter in pretending that he did...[o]ne cannot misuse power that one no longer possesses."). The City of Chicago expressly disclaimed Defendant Collie's power to carry a gun, fire a gun, or arrest suspects. He was inarguably a special police officer, but without additional evidence it cannot be said that he *ever* could have acted with the color of law. Even Plaintiff's avowed belief that Collie could act on behalf of the state in terms of arrests and firearm use is not sufficient to counter a lack of authority. *See Gibson*, 910 F.2d at 159 n. 12 ("We note that some courts have considered as part of its "color of law" analysis the victim's perceptions that the officer was acting under color of law. However, as the above discussion makes clear, such perceptions cannot be dispositive in a situation such as this in which the actor possessed absolutely no authority to act.").

If Plaintiff is to be believed that Collie verbalized an intent to shoot or arrest her, this is not an extension or misuse of state power but rather an invention of it. The nexus between such actions and the authority of the state is so minimal as to preclude a finding that "the state must somehow be responsible for the allegedly unlawful actions taken by the private party." *Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786. Defendant Collie's involvement therefore fails to provide the requisite color of law to support Plaintiff's section 1983 claims.

Plaintiff makes other attempts at establishing state action, referring this Court to the fact that: (1) "[Arun] Defendants receive payment of rents from its not-for-profit tenants using government funds"; (2) the attorney Defendants "are attorneys-at-law under the laws of the State fo Illinois and are state actors"; (3) CPD officers became involved by responding to Plaintiff's phone calls; and (4) "Defendants utilized a judicial proceeding to force Raynie Jackson and others to trespass, search, seize, and illegally remove Plaintiff's property from the premises." However, all of these fail as bases for finding that "color of law" was involved.

Plaintiff does not support the first contention with any evidence other than her own conclusory statements and, even if she had, the presence of federal funding is not sufficient grounds for implicating state authority. *See Spencer v. Illinois Cmty. Action Ass'n*, 51 Fed.Appx. 973 (7th Cir. 2002) (finding no color of law where official administering federal funds had no connection to the alleged deprivation); *Ridlen v. Four County Counseling Ctr.*, 809 F.Supp. 1343, 1354-55 (N.D. Ind. 1992). The second allegation has no support as a matter of law. *See Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445 (1981) (finding that a public defender – notably more closely allied to state functions than Defendants in the instant case – "does not act under color of state law when performing a lawyer's traditional functions as counsel to a

defendant in a criminal proceeding"). Finally, as to Defendants' third and fourth points, the fact that the Defendants were purported to have abused the judicial system by pursuing legal attacks, and that CPD officers responded to her phone calls in ways that she deems inadequate, in no way amounts to a sufficient nexus with the power of the state. *See Case v. Milewski*, 327 F.3d at 567 (requiring that "the state officials and the private party somehow reached an understanding to deny the plaintiffs their constitutional rights"). Plaintiff nowhere provides evidence to show outright wrongdoing of or an alignment of interests involving the police officers who came to assist her or the judicial officers who were involved in related proceedings.

For all of the reasons stated above, Plaintiff's claim that the alleged actions were taken under "color of law" fails. Summary judgment is therefore GRANTED with respect to all section 1983 claims (Counts III, IV, V, VI, VIII, & X).

e.       Conspiracy under 42 U.S.C. § 1985 (Count XI)

A claim of conspiracy to deprive an individual of his or her legal rights requires: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Broth. of Carpenters and Joiners of Am., Local 610, AFL-CIO*, 463 U.S. 825, 103 S.Ct. 3352 (1983).

Plaintiff has provided no evidence that the Defendants in this case "agreed to inflict injury upon him; in other words, that they acted with a single plan, the general nature and scope of which was known to each conspirator." *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002).

Her proof of the conspiracy amounts to the fact that there was some connection between the Defendants and that they all took actions that in some way had a negative impact on her. There is no evidence, circumstantial or otherwise, that a meeting of the minds occurred among the alleged co-conspirators in which they developed any sort of common understanding of what their objectives would be. *Id.* at 665-66. Plaintiff again attempts to counter this argument by stating that documents and evidence were taken from her and that Plaintiff "can not pled [sic] that [she] does not have the evidence." Pl.'s Resp. to Kameli Defs.' Summ. J. Mot. at 15. However, she once again provides this Court with no explanation of how the missing materials might have strengthened her complete lack of support for this necessary element of a conspiracy under section 1985.

In addition, any claim of conspiracy under section 1985 must be based upon evidence of an intent to deprive the plaintiff of his or her constitutional rights. *See Majeske,* 94 F.3d at 311 (plaintiff must show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [was] behind the conspirators' action"). As Plaintiff has not established that her status was a "substantial or motivating factor" in the adverse actions taken against her, there is no basis for finding that there was a conspiracy to do so.

For these reasons, summary judgment is GRANTED against Count XI with respect to all Defendants.

## CONCLUSION

For the foregoing reasons, Defendants' motions for Summary Judgment are GRANTED.


Enter:


/s/ David H. Coar
_____

David H. Coar
United States District Judge

Dated: **July 19, 2007**